# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
July 10, 2013 Session

## STACY CHRISTINA KNELLINGER v. MARK STEVEN KNELLINGER AND BECKI KNELLINGER

**Appeal from the Chancery Court for Williamson County**
**No. 34418       Robbie T. Beal, Judge**

**No. M2012-02343-COA-R3-CV - Filed August 29, 2013**

In this post-divorce action, Father filed two petitions asserting several counts of criminal contempt against Mother based on alleged violations of the Parenting Plan. Father also petitioned the court to modify the Parenting Plan to name him the primary residential parent and grant him sole decision-making authority over the children's educations, non-emergency healthcare, and extracurricular activities. Mother then filed a petition seeking to permanently enjoin Father's new wife ("Step-mother") from participating in certain activities with the children, such as signing their school report cards, volunteering at the school, and sending home notes in their lunch boxes. After a three-day hearing, the trial court found Mother guilty on three counts of criminal contempt, and assessed a $150 fine (fifty dollars per count), which the court required her to pay toward counseling with Father. The trial court denied Father's Petition to Modify the Parenting Plan, finding there was no material change of circumstances affecting the children's interest, a finding which Father does not appeal. The trial court also denied Mother's petition for a permanent injunction against Step-mother, finding it was unnecessary. Both parties were required to pay their own attorney's fees. We affirm the trial court's decision to deny Mother's request for a permanent restraining order against Step-mother. However, we have determined the trial court erred in finding Mother guilty of criminal contempt, and we reverse all three convictions. Finally, we find Mother is entitled to her reasonable and necessary attorney's fees incurred in the trial court in defense of Father's Petition to Modify the Parenting Plan, pursuant to Tennessee Code Annotated § 36-5-103(c), and remand for a determination and award thereof.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in part, Affirmed in part, and Remanded.**

FRANK G. CLEMENT, JR. delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S. and RICHARD H. DINKINS, J.J., joined.

Robert E. Lee Davies, Joshua Lee Rogers, Franklin, Tennessee, for the appellant, Stacy Christina Knellinger.

Elizabeth A. Garrett, Jessica Hooper, Nashville, Tennessee, for the appellees, Mark Steven Knellinger and Becki Knellinger.

## OPINION

Stacy C. Knellinger ("Mother") was granted a divorce from Mark S. Knellinger ("Father") on the grounds of adultery on February 10, 2010. Mother was designated the primary residential parent for the parties' two minor children, Zachary and Timothy, then aged seven and three. Father was granted visitation with the children every other Wednesday through Sunday during the school year, and alternating weeks in the summer. The parties alternated Thanksgiving break, and Father was given the first half of Christmas break in odd-numbered years, and the second half in even-numbered years. Father was ordered to pay $1,193 per week in child support.

The parties' Permanent Parenting Plan provides that decisions regarding the children's religious upbringing will be made jointly, and that Mother shall have sole decision-making authority over the children's educations and non-emergency health care, after consultation with Father. Mother was also granted sole decision-making authority over the children's extracurricular activities, but the Parenting Plan further provides that: "Father will be able to choose one (1) extracurricular activity per child at a time at Father's expense, and Mother will have to take the children to these events."

Shortly after the parties divorced, Father married Becki Knellinger ("Step-mother"), with whom he had been romantically involved during the parties' marriage. Mother and Step-mother have never been on good terms with one another, and Mother often expressed that she felt Step-mother was attempting to usurp Mother's authority with the children and interfering with Mother's parenting time, and furthermore that Father was allowing and encouraging Step-mother to do so. Mother, Father, and Step-mother live in the same neighborhood and are all three very involved in the children's school, church, and extra-curricular activities. As a consequence, opportunities for confrontations among the three of them occurred frequently.

Despite Mother's request that Father and Step-mother not take cupcakes to school for Zachary's birthday, because Mother was, Father and Step-mother nevertheless took cupcakes to school for Zachary's birthday. On occasion, Step-mother signed the children's daily school report cards, and often sent notes in the children's lunch boxes, which Mother saw when the children brought their report cards and lunch boxes home. Step-mother once took Timothy

to a doctor's appointment without Father, and did not tell Mother about it until several days later. Father and Step-mother also showed up to a Halloween event for the children at Mother's church during Mother's parenting time, without telling Mother ahead of time they would be there.

As for Mother, after she noticed Step-mother taking photographs of the children during school and sporting events, Mother started taking photographs of Step-mother at these events, without explanation. She frequently refused to respond to Father's emails or texts, even when they were about the children, and ignored Step-mother when Step-mother attempts to speak to her.

The children's sporting events have been particularly difficult for the parties to navigate. Father coaches both children's baseball and soccer teams, and Step-mother usually serves as his assistant. She emails team schedules and other information to the parents of other children on the team, organizes equipment and uniforms, and keeps the children on task during practices and games. During the 2010 baseball season, Step-mother also wore a tee-shirt to Zachary's games, which Mother usually attended, that read "Team Mom" across the front. To Step-mother's credit, she stopped wearing the shirt after Mother expressed that it was hurtful and embarrassing to Mother. However, more than once, Step-mother approached Mother to offer Mother unsolicited – and unwelcome – parenting advice. On one occasion, at one of Timothy's baseball games, Mother and her mother (the children's maternal grandmother) entered the dugout to sit with Timothy. Step-mother asked them to leave, at Father's request, but they refused until they were asked to do so by the umpire of the game. These are just a few examples of the kinds of passive-aggressive, and aggressive, behavior the parties have engaged in after the divorce that have made co-parenting difficult.

The tension between the parties culminated with Father filing a Petition for Criminal Contempt and for Other Relief against Mother, on December 3, 2010, just eight months after the final divorce decree was entered. He alleged six counts of criminal contempt; however, only Counts Three and Four are at issue in this appeal.[1] Both counts involved encounters

---

[1]Counts One and Two involved an incident at Mother's church. Father and Step-mother decided to begin attending Mother's church, where Father had also attended during his marriage to Mother, without telling Mother. After an encounter outside the children's Sunday School classroom, Mother asked to be escorted to her car, and was escorted by a police officer, which the children observed. Count Five involved the incident where Mother and the maternal grandmother would not leave the baseball dugout during Timothy's game. Finally, in Count Six, Father alleged Mother refused to let Zachary telephone Father during Mother's parenting time. The trial court found there was not sufficient evidence that Mother was guilty of contempt for Counts One, Two and Five. Father voluntarily withdrew Count Six prior to trial.

(continued...)

between Mother and Step-mother at the children's soccer events. In Count Three, Father alleged that Mother "became infuriated with [Step-mother] because [Step-mother] attempted to give Zachary a piece of chocolate," at Zachary's soccer practice on October 26, 2010, which was during Mother's parenting time. The encounter ended with Mother stating, "Give me your best shot," to Step-mother, before the parties separated. Mother was holding Timothy at the time, who was three years old. As for Count Four, Father alleged that at Timothy's soccer game on September 18, 2010, Mother "continuously picked up Timothy and tried to distract him from playing in his game," and "took off his cleats and began feeding him yogurt."

For both counts, Father alleged Mother was in violation of the preamble to the Parenting Plan, which provides:

> The Mother and Father will behave with each other and each child so as to provide a loving, stable, consistent and nurturing relationship with the child even though they are divorced. They will not speak badly of each other or the members of the family of the other parent. They will encourage each child to continue to love the other parent and be comfortable in both families.

Father further alleged Mother's conduct was in violation of Father's "right to be free of unwarranted derogatory remarks made about the parent or his or her family by the other parent to the child or in the presence of the child," as provided in Section VI of the Parenting Plan, and Tennessee Code Annotated § 36-6-101(a)(3). Father requested that Mother be incarcerated for ten days on each count.

Mother denied Father's allegations, and on July 28, 2011, filed her own Petition for Relief, seeking a permanent injunction "restraining Father and [Step-mother] from asking the parties' minor children to refer to [Step-mother] as 'mom.'" Mother also requested that the court permanently restrain Step-mother from "the activities she has been participating in which have undermined or interfered with Mother's role as the children's parent," including "attending school parties or volunteer[ing] as a room parent, signing report cards and other school assignments, sending notes home with the children, volunteering as the children's 'team mom' if there are other volunteers, or any other disruptive activity found by the Court." Mother also requested that Father be restrained from allowing Step-mother to engage in any of these activities while she is in his presence.

---

[1](...continued)
Father also requested a reduction in his alimony in solido payment; however, he voluntarily withdrew that request prior to trial as well.

On April 18, 2012, Father filed an Amended and Supplemental Petition for Criminal Contempt and for Other Relief and Petition to Modify Permanent Parenting Plan. Father alleged four new counts of contempt, but only Count Four is at issue in this appeal.[2] For Count Four, Father alleged Mother is in criminal contempt of court for her alleged "refusal to support Zachary's participation in baseball," in violation of section II(B) of the Parenting Plan. The Section provides that Mother shall have sole decision-making authority regarding the children's extracurricular activities, but that "Father will be able to choose one (1) extracurricular activity per child at Father's expense, and Mother will have to take the children to these events." Father alleged that Mother "frequently brings Zachary to games and practices late which results in Zachary feeling rushed and embarrassed." Finally, Father sought several major amendments to the Parenting Plan, including that he be named primary residential parent and be given sole decision-making authority over the children's education, non-emergency healthcare, and extracurricular activities. As the basis for his requested modifications, Father asserted that a material change of circumstances had occurred because Mother "has shown no desire to co-parent" and "has been overtly hostile and demeaning" toward Father.

A hearing on all three petitions took place on April 18, 19, and 20, 2012. At the start of the hearing, Father informed the court that he was no longer seeking jail time for Mother's allegedly contemptuous behavior. Step-mother was also joined as a party to the action. The only witnesses who testified were Mother, Father, and Step-mother.

At the close of the hearing, the trial court found Mother guilty of Counts Three and Four of Father's original Petition and Count Four of the Amended Petition, fined Mother $50 for each count and ordered Mother to pay toward family counseling with Father. The trial court denied Father's request to modify the Parenting Plan, finding that the proof "didn't even come close" to establishing the "material change of circumstances affecting the child[ren]'s best interest" that is required by Tennessee Code Annotated § 36-6-101(a)(2)(C). The trial court also denied Mother's Petition for Relief, finding that while Step-mother had overstepped her bounds on occasion, a restraining order was unnecessary, and some of the activities Mother sought to enjoin – such as assisting Father in coaching the children's sports teams – were positive for the children and helpful for Father. The trial court denied both parties' requests for attorney's fees.

---

[2]In Count One, Father alleged that Mother denied Father's parenting time on August 9, 2011. The trial court determined the parenting plan was ambiguous as to whose parenting time it was, and thus, Mother was not in contempt for not allowing the children to go with Father. Father does not appeal that finding. In Counts Two and Three, Father alleged Mother refused to consult Father on Education and Non-Emergency Healthcare Issues, respectively. The trial court determined the evidence was insufficient to support a finding of contempt against Mother on either of these counts.

ISSUES

Mother argues the trial court erred in holding her in contempt of the Parenting Plan because the preamble is impermissibly vague and ambiguous as to whether her conduct was prohibited. She also argues the trial court erred in denying her request for an injunction against Step-mother, and in denying her request for attorney's fees. Father raises no issues on appeal.[3] We will consider each issue in turn.

## I. Criminal Contempt

The purpose of criminal contempt is to "preserve the power and vindicate the dignity and authority of the law" as well as to preserve the court "as an organ of society." *Black v. Blount*, 938 S.W.2d 394, 398 (Tenn. 1996); *see also Thigpen v. Thigpen*, 874 S.W.2d 51, 53 (Tenn. Ct. App. 1993). Criminal contempt is generally regarded as a crime.[4] *Id.* at 402. Therefore, a criminal contempt proceeding "in a very true sense raises an issue between the public and the accused." *Id.* at 398. Accordingly, criminal contempt is not to be used to benefit the contemnor's adversary; that is the office of civil contempt. *See Overnite Transp. Co. v. Teamsters Local Union No. 480*, 172 S.W.3d 507, 510 (Tenn. 2005) (stating that a civil contempt action is generally brought to enforce private rights). "[C]ivil contempt is designed to coerce compliance with the court's order and is imposed at the insistence and for the benefit of the private party who has suffered a violation of rights." *Doe v. Bd. of Prof'l Responsibility of Supreme Court of Tenn.,* 104 S.W.3d 465, 473-474 (Tenn. 2003).

---

[3]Father is barred from appealing Mother's acquittal of Counts One, Two and Five of his original Petition for Contempt, and Counts One, Two and Three of his Amended and Supplemental Petition. *See Overnite Transp. Co. v. Teamsters Local Union No. 480*, 172 S.W.3d 507, 510 (citing *Ahern v. Ahern*, 15 S.W.3d 73, 80-82 (Tenn. 2000); *State v. Wood*, 91 S.W.3d 769, 773 (Tenn. Ct. App. 2002)) ("Criminal contempt cases are subject to the double jeopardy provisions in the federal and state constitutions. Thus, an appeal from an acquittal of criminal contempt is barred.").

[4]While we agree that criminal contempt is generally regarded as a crime, see *Bloom v. Illinois*, 391 U.S. 194, 201 (1968), prosecutions of criminal contempt

> are not intended to punish conduct proscribed as harmful by the general criminal laws. Rather, they are designed to serve the limited purpose of vindicating the authority of the court. In punishing contempt, the Judiciary is sanctioning conduct that violates specific duties imposed by the court itself, arising directly from the parties' participation in judicial proceedings.

*Black v. Blount*, 938 S.W.2d 394, 398 (Tenn. 1996) (quoting *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 800 (1987)).

The power of courts to punish a party for contempt is delineated in Tennessee Code Annotated § 29-9-102. "Unless the contemptuous act was committed in the presence of the court, proceedings for criminal contempt must comply with Tenn. R. Crim. P. 42(b)."[5] *Long v. McAllister-Long,* 221 S.W.3d 1, 12 (Tenn. Ct. App. 2006). Rule 42(b) reads:

(b) Disposition on Notice and Hearing. A criminal contempt shall be prosecuted on notice, except as provided in subdivision (a) of this rule.

(1) Content of Notice. The criminal contempt notice shall:

(A) state the time and place of the hearing;
(B) allow the defendant a reasonable time to prepare a defense; and
(C) state the essential facts constituting the criminal contempt charged and describe it as such.

(2) Form of Notice. The judge shall give the notice orally in open court in the presence of the defendant or, on application of the district attorney general or of an attorney appointed by the court for that purpose, by a show cause or arrest order.

Tenn. R. Crim. P. 42(b).

Tennessee Rule of Criminal Procedure 42(b) mandates that a party facing a criminal contempt charge be given "explicit notice that they are charged with criminal contempt and must also be informed of the facts giving rise to the charge."[6] *Long*, 221 S.W.3d at 12. Although the party seeking to hold another in indirect criminal contempt should draft the petition as 42(b) requires, it is the duty of the court in which a petition for indirect criminal contempt is filed to assure that the accused receives adequate notice of the charges. *Id.* at 13 (citing *McPherson v. McPherson*, No. M2003–02677–COA–R3–CV, 2005 WL 3479630 at *5 (Tenn. Ct. App. Dec.19, 2005); Tenn. R. Crim. P. 42(b)).

---

[5]"Criminal contempt is either direct or indirect. Disruptive or disobedient acts committed in the court's presence constitute direct criminal contempt." *Long v. McAllister-Long,* 221 S.W.3d 1, 12 n.11 (Tenn. Ct. App. 2006) (citing Tenn. Code Ann. § 29-9-102(1) (2000); *Black v. Blount*, 938 S.W.2d at 398; *State v. Maddux*, 571 S.W.2d 819, 821 (Tenn. 1978)). "Contemptuous acts committed outside the court's presence constitute indirect criminal contempt." *Id* (citing *State v. Maddux*, 571 S.W.2d at 821).

[6]Notice of a charge of indirect criminal contempt may specify multiple violations so long as they are sufficiently distinct to support separate convictions. *State v. Wood*, 2002, 91 S.W.3d 769, 775 (Tenn. 2002) (citing Tenn. R. Crim. Proc. Rule 42(b)).

To convict a person of criminal contempt of a court order, four essential elements must be established:

First, the order alleged to have been violated must be "lawful." Second, the order alleged to have been violated must be clear, specific, and unambiguous. Third, the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order. Fourth, the person's violation of the order must be "willful."

*Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 354-55 (Tenn. 2008) (internal citations omitted). Specifically regarding the second element, the *Konvalinka* court went on to explain:

A person may not be held in . . . contempt for violating an order unless the order expressly and precisely spells out the details of compliance in a way that will enable reasonable persons to know exactly what actions are required or forbidden. The order must, therefore, be clear, specific, and unambiguous.

Vague or ambiguous orders that are susceptible to more than one reasonable interpretation cannot support a finding of . . . contempt. Orders need not be "full of superfluous terms and specifications adequate to counter any flight of fancy a contemnor may imagine in order to declare it vague." They must, however, leave no reasonable basis for doubt regarding their meaning.

Orders alleged to have been violated should be construed using an objective standard that takes into account both the language of the order and the circumstances surrounding the issuance of the order, including the audience to whom the order is addressed. Ambiguities in an order alleged to have been violated should be interpreted in favor of the person facing the contempt charge.

*Id.* at 355-356. While appellate courts review the substance of contempt judgments under an abuse of discretion standard, the question of whether an order is sufficiently clear to support a conviction for contempt is a question of law, which we review de novo. *Id.* at 356.

The court order Mother was convicted of willfully violating on three occasions was the preamble to the parties Parenting Plan, which states:

The Mother and Father will behave with each other and each child so as to

provide a loving, stable, consistent and nurturing relationship with the child even though they are divorced. They will not speak badly of each other or the members of the family of the other parent. They will encourage each child to continue to love the other parent and be comfortable in both families.

## A. INCIDENT OCCURRING ON OCTOBER 26, 2010

One of Mother's three convictions stems from the October 26, 2010, incident at Zachary's soccer practice, when Mother allegedly failed to "de-escalate" an argument by responding to Step-mother's layperson pediatric dental hygiene advice by saying "let's have it, let me hear what you've got, just give me your best shot" during an argument between the two women. The confrontation began because Step-mother approached Zachary, during Mother's parenting time, and offered him candy. Mother, who was standing near Zachary, asked Step-mother not to give him candy because Zachary had been to the dentist that day, and an argument ensued over what constituted appropriate pediatric dental care and why Mother did not want Step-mother contacting the children's dentist. After Mother told Step-mother to "let's have it, let me hear what you've got, just give me your best shot," the parties separated and the confrontation ended. The trial court found that "neither party legitimately believed that there was going to be a first fight between the parties," but that Mother should nevertheless be convicted of criminal contempt because, "Mother was not trying to de-escalate the situation."

An ordinary person reading a court's order "should be able to ascertain from the document itself exactly what conduct is prescribed." *Hogue v. Hogue*, 147 S.W.3d 245, 248 (Tenn. Ct. App. 2004) (quoting Wright, Miller & Kane, *Federal Practice and Procedure Civil 2d* § 2955)). There is no order in this case that clearly, specifically, and unambiguously places Mother under an affirmative duty to "de-escalate" a confrontation that was instigated, and worsened, by Step-mother's intrusive and provocative acts. To put it simply, Step-mother started it, and in concert with Mother, escalated the situation. Further, Mother had repeatedly, and justifiably, asked Step-mother to "give her space," especially during Mother's parenting time. Moreover, while inappropriate in the presence of the child, Mother's comment was relatively innocuous considering the circumstances, and if anyone in that situation jeopardized the "loving, stable, consistent and nurturing relationship" the parents share with the children it was Step-mother.

Mother's action, or more accurately stated, Mother's reaction to Step-mother pushing herself upon Mother and the child in this situation does not constitute a willful violation of a clear, specific, and unambiguous order of the court; therefore, it cannot be a basis for criminal contempt. *See* Tenn. Code Ann. § 29-9-103.

The second of Mother's convictions stems from the incident at Timothy's soccer game on September 18, 2010, when Mother helped Timothy, who was only three-years-old, off of the soccer field because he was throwing a tantrum lying on the field in an emotional meltdown. After helping him off the soccer field, she removed his cleats and fed him yogurt, because, as Mother explained, Timothy was very upset and did not want to play. Father's account of the incident was that, "at one point [Mother] came out on the field, which is pretty unusual in a 28-minute game . . . , and she said that 'I think that if you would take this approach with him it would be more successful.'" Father claimed that Mother's actions "interrupted the flow of the game," which he felt "was inappropriate." The trial court found that Mother's behavior at the game "was overreaching," and it "undermined" Father's authority as Timothy's coach and parent. Based upon these findings, the trial court held Mother in criminal contempt.[7]

We find it unnecessary to say much about the facts that allegedly constituted willful contempt of the preamble other than the fact that Timothy was only three years old, he was obviously very upset as he sat or laid on the soccer field as the participants ran back and forth chasing the ball, and his Mother was justifiably concerned for his welfare. Considering these facts in light of the order at issue – the aspirational preamble to the Parenting Plan, the evidence in this record falls well below proving beyond a reasonable doubt that Mother's actions at Timothy's soccer game on September 19, 2010 constituted a willful violation of the preamble or any order of the court. Stated another way, it is unlikely that a reasonable person in Mother's position would expect to be held in criminal contempt – and possibly be sentenced to jail time – for simply attending to the immediate needs of her very young child. *See Furlong v. Furlong*, 270 S.W.3d 329, 339 (Tenn. Ct. App. 2011).

Father testified that Timothy "didn't like people taking the ball away from him," which is typical of a three-year-old child, but Father felt strongly that Timothy needed to understand that, "well, that's what soccer is." We respect Father's desire to teach his children appropriate life lessons and to exhibit good sportsmanship; however, it is not a contemptuous crime for a mother to escort her three-year-old off of a soccer field when in distress. Father coaches Timothy in soccer and in baseball, which is admirable of him, and he will have many

---

[7]In the original Petition, Father alleged that this incident constituted a violation of the preamble to the Parenting Plan; however, when ruling from the bench, the trial court found the proof was insufficient to establish beyond a reasonable doubt that Mother's actions on that day violated the preamble, but that Mother's actions on that day did violate the provision of the Parenting Plan providing that allowed Father to choose one extra-curricular activity for each child, and "Mother will have to take the children to these events." The trial court's written final Order does not specify which provision Mother was held in criminal contempt for violating; however, we find Mother's actions on that day do not violate either provision.

more opportunities to teach Timothy important life lessons. We can only hope that other authority figures can teach Father the gravity of filing petitions accusing his children's mother of criminal offenses that carry the possibility of jail time, and which require each parent to exhaust financial resources that could best be used for the benefit of the children.

We have determined that the Parenting Plan did not clearly and unambiguously prohibit Mother's conduct on these two occasions. This finding requires that Mother's convictions for Counts Three and Four of Father's original Petition for Contempt be reversed. *See Konvalinka*, 249 S.W.3d at 359; *Furlong*, 370 S.W.3d at 340; *Hogue*, 147 S.W.3d at 249.

## C.  ARRIVING LATE FOR PRE-GAME ACTIVITIES

In Count Four of the Amended Petition, Father alleged Mother violated the provision of the Parenting Plan that requires Mother, during her parenting time, to bring the children to an extra-curricular activity of Father's choosing. Father chose baseball for Zachary, the older son, and Father was the coach of the team.

As coach, Father required all of his players arrive thirty minutes prior to the game for stretching and pre-game orientation. The allegation was that Mother was in willful violation of the court's order by failing to always get the child to the game thirty minutes prior to commencement of the game. The trial court held Mother in criminal contempt for violating the aspirational preamble upon the finding that "Mother did not get [Zachary] to some of his [baseball] games 30 minutes prior to their start as was Father's request."

A condition precedent to a trial court imposing punishment for indirect criminal contempt is that the contempt defendant be provided formal notice as required by Tenn. R. Crim. P. 42(b). *Bailey v. Crum*, 183 S.W.3d 383, 388 (Tenn. Ct. App. 2005). "[N]otification under Rule 42(b) is insufficient unless it provides a description of the particular actions alleged to be contemptuous *and sets forth the dates and location of such actions*." *Id.* at 389 (emphasis added). Father's petition did not identify a specific date that Mother was late in bringing Zachary to his baseball game nor was there any evidence of a specific date for which she was tardy. These deficiencies, without more, would require that we reverse this conviction. Moreover, the record contains no competent evidence to establish that Mother's tardiness for any pre-game stretching exercise and orientation constituted a willful intent to violate any order by the court, which is an essential element of criminal contempt. *See* Tenn. Code Ann. § 29-9-102(3). Thus, this deficiency would also require reversal of this conviction.

For the above reasons, all three convictions for criminal contempt are reversed.

D. Alternatives to Petitions for Contempt

As noted earlier, criminal contempt is only to be used to preserve the power and vindicate the authority of the court and the law, *Black*, 938 S.W.2d at 397, it is not to be brandished as a weapon to torment former spouses in order to benefit the adversary. As the trial court correctly noted, Mother, Father, and Step-mother, are having problems "that will effect the children," and if they "don't get on the same page, . . . the kids [will] suffer." The children are involved in multiple school, church, and extra-curricular activities, which are important and beneficial to the children, nevertheless, there will be occasions that one parent or the other is late. Moreover, there will be times the parents differ on parenting issues. When such occur in the future, the parties should consider whether a continuance of the recent Rambo style litigation is more likely to benefit or harm the children and their relationships with the parents. Mediation, if necessary and appropriate, would likely be more beneficial and less costly.

## II. The Restraining Order against Step-Mother

Mother argues the trial court erred in denying her Petition for a restraining order prohibiting Step-mother from attending the children's school parties or volunteering as a room parent, signing the children's report cards and other school assignments, sending notes home with the children, volunteering with the children's sports teams, or "any other" activities that are "disruptive" Mother's role as a parent.[8]

The purpose of restraints on parental conduct is to protect the child. *Hogue*, 147 S.W.3d at 751. "The restraints to be placed on a parent should be well-defined and 'must involve conduct that competent evidence shows could cause harm to the child.'" *Marlow v. Parkinson*, 236 S.W.3d 744, 751 (Tenn. Ct. App. 2007) (quoting *Bates v. Bates*, No. 03A01-9412-CH-00426, 1995 WL 134907, at *3 (Tenn. Ct. App. March 30, 1995)).

Trial courts are given broad discretion in matters of child custody, visitation and related issues. *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999). These decisions often hinge on subtle factors, such as the parents' demeanor and credibility during the proceedings. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). Accordingly, trial

_____

[8]In her Petition for Relief, Mother also requested the trial court "enter a permanent injunction enjoining and restraining Father from allowing [Step-mother] to engage in any of the above activities while she is in his presence." On appeal Mother only seeks a reversal of the trial court's decision only as to Step-mother; thus, pursuant to Tennessee Rule of Civil Procedure 65.01, the order Mother seeks is properly classified as a restraining order. Tenn. R. Civ. P. 65.01 ("A restraining order shall only restrict the doing of an act. An injunction may restrict or mandatorily direct the doing of an act.").

courts have discretion to fashion custody and visitation arrangements that best suit the unique circumstances of each case. *Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999). Step-mother is married to Father, resides in Father's home and has a close relationship with the children; thus, the trial court's decision to deny the restraining order is entitled to the same deference. *See also Medtronic, Inc. v. NuVasive, Inc.*, No. W2002-01642-COA-R3-CV, 2003 WL 21998480, at *10 (Tenn. Ct. App. Aug. 20, 2003) ("The standard of respective injunctive relief is whether the trial court erred in exercising its discretion in the issuance or nonissuance of the injunction.") (citing *Bd. Of Comm'rs of Roane Cnty. v. Parker*, 88 S.W.3d 916, 919 (Tenn. Ct. App. 2002)).

The trial court's determination that a restraining order against Step-mother is unnecessary at this time is supported by the evidence presented to the trial court. Despite her past transgressions, Step-mother has voluntarily changed her behavior, and as the trial court found, she "is figuring it out." Although Mother understandably found some of Step-mother's behavior offensive and intrusive, the best interest of Mother is not the operative issue; the best interest of the children is the operative issue. *See Bates*, 1995 WL 134907, at *3 ("To the extent that the trial court imposed the restriction because it felt that Wife would be offended or hurt by the mere fact that the child is in the company of a woman whose conduct arguably caused or substantially contributed to the break-up of the marriage, it incorrectly substituted the best interest of Wife for the appropriate standard, the best interest of the child."). Furthermore, Mother's request to enjoin Step-mother from "any other disruptive activities," does not meet the requirements of Tennessee Rule of Civil Procedure 65.02(1), because it "does not 'describe in reasonable detail, . . . the act restrained or enjoined.'" *Marlow*, 236 S.W.3d 744, 753 (Tenn. Ct. App. 2007) (quoting *Hogue*, 147 S.W.3d at 255).

For these reasons, we affirm the trial court's decision to deny Mother's Petition for a permanent restraining order against Step-mother.

### III. Attorney's Fees

For her last issue, Mother argues the trial court erred in denying her request for attorney's fees. She also asks this Court to award her attorney's fees on appeal.

Tennessee Code Annotated § 36-5-103(c) provides:

The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in . . . *any suit or action concerning the adjudication of the custody or the change of custody*

*of any child, or children, of the parties*, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

(Emphasis added).

In his Amended Petition, Father alleged that a material change of circumstances occurred due to Mother's inability to co-parent after the divorce, and he requested that the Parenting Plan be modified to designate him as the primary residential parent. The trial court denied the petition to modify upon the finding that Father's allegation of a material change in circumstances affecting the children was without merit:

> And as far as the petition to modify, the complaints you [Father] have are legitimate complaints perhaps. I found a few contemptuous even. But on the same token, do they represent a material change of circumstances . . . Do they represent a material change of circumstance in the relationship of the parties that would necessitate a change of custody, a fairly big step? No, not even close, didn't even come close.
>
> Are you all having a problem? Yes. Is it going to affect the kids? Yes. If you all don't get on the same page, will the kids suffer? Yes. Is she standing in the way of your ability to parent the children to such a degree that you should have custody? Oh, no, no, not even.
>
> Petition to modify the parenting plan in any way is denied for a lack of material change of circumstances.

Nevertheless, the trial court denied Mother's request for attorney's fees. It is clear from the trial court's explanation of its decision that the court relied, in part, on its finding that Mother was guilty of three counts of criminal contempt:

> The Petition to Modify has failed. The majority of the contempt petitions have failed. A few contempt petitions have been sustained. [Mother], in response, filed a request for a restraining order. It has failed.
>
> Considering . . . [the] legal victories on behalf of [Father], the denial of [Mother's] claim, but the fact that we wouldn't be here at all if [Father] hadn't filed the claim, the fact is that the Court is not willing to assess attorney's fees against either party.

-14-

Because we have reversed all three of Mother's convictions for criminal contempt, we find that Mother is entitled to her reasonable attorney's fees incurred in successfully defending Father's Petition to Modify the Parenting Plan in the trial court pursuant to Tennessee Code Annotated § 36-5-103(c), but only to that extent. Mother is not entitled to recover attorney's fees and expenses incurred in relation to the other claims and issues addressed in the trial court.

Father did not appeal the trial court's decision to deny his Petition to Modify the Parenting Plan. The issues Mother has prevailed upon in this Court – the reversal of her convictions for contempt – do not involve custody questions. Other than the above-quoted statute, Mother presents no basis upon which we may award her attorney's fees; thus, her request for attorney's fees incurred in this appeal is respectfully denied.

## IN CONCLUSION

The judgment of the trial court is affirmed in part, reversed in part, and remanded for a determination and award of Mother's reasonable and necessary attorney's fees incurred in defending Father's Petition to Modify the Parenting Plan. Costs of appeal are assessed against Father and Mother equally.

_____
FRANK G. CLEMENT, JR., JUDGE